UNITED STATES of America,
Plaintiff,

v.

Thomas P. GORDON, Sherry
L. Freebery, and Janet K.
Smith, Defendants.

No. CR.A. 04–63–KAJ.

United States District Court,
D. Delaware.

Sept. 8, 2004.

Colm F. Connolly, United States Attorney, Leonard P. Stark, Assistant United States Attorney, Ferris W. Wharton, Assistant United States Attorney, United States Attorney's Office, Wilmington, DE, Counsel for Plaintiff.

Thomas P. Gordon, Wilmington, DE, pro se Defendant.

Thomas A. Pedersen, Wilmington, DE, Of Counsel: Hamilton P. Fox, III, Thomas R. Bundy, III, Washington, DC, Lawrence J. Fox, Esquire, Drinker Biddle & Reath, Philadelphia, Pennsylvania, Counsel for Defendant Sherry L. Freebery.

Joseph A. Hurley, Wilmington, DE, Counsel for Defendant Janet K. Smith.

Richard H. Cross, Jr., Cross & Simon, LLC, Wilmington, DE, Counsel amicus curiae.

## MEMORANDUM OPINION

JORDAN, District Judge.

*Introduction*

I have before me a motion (Docket Item ["D.I."] 21; the "Motion") to admit Hamilton P. "Phil" Fox, III, Esquire ("Mr. Fox") to serve *pro hac vice* in this case as defense counsel for defendant Sherry L. Freebery. Typically, *pro hac vice* motions are granted as a matter of routine, but this case is not routine and, both before and since the Motion was filed, Mr. Fox's participation as defense counsel has been the subject of controversy, first being questioned by the United States Attorney's Office, then by a citizen's group, and finally by three members of the New Castle County Council. On August 23, 2004, I held an evidentiary hearing on the Motion and heard argument with respect to it. For the reasons set forth herein, and with no disrespect meant to Mr. Fox, his firm, or any other participant in the proceedings, I will deny the Motion.

*Background* [1]

This case is the culmination of a lengthy and highly publicized investigation into alleged political corruption in the government of New Castle County. On May 26, 2004, a federal grand jury returned an eleven count indictment leveling conspiracy, racketeering, wire fraud, and mail fraud [2] charges against Thomas P. Gordon, who is the elected County Executive, Ms. Freebery, who is the Chief Administrative Officer of the County appointed by Mr. Gordon, and Janet K. Smith, who served as an Executive Assistant in the Gordon Administration. (D.I. 1.)

Early in the investigation, on September 24, 2002, the United States served grand jury subpoenas on the County. (Tr. at

---

1. The background information provided in this section is drawn from the parties' submissions (D.I. 3, 4, 16, 21), the amicus briefing (D.I. 27), the letter submitted to the Court on August 23, 2004 by County Council President Coons and Councilmen Weiner and Hollins (D.I. 29), and the record developed at the hearing on that date. The information does not constitute findings of fact.

2. Not all of the defendants are charged in all of the counts.

36.)[3] Someone from the County government called Mr. Fox that afternoon to retain him to represent the County in responding to the subpoenas. As Mr. Fox recounts it, "the subpoenas were very broad and potentially involved many County employees who might have responsive documents. They also called for personnel records of certain County employees." (D.I. 4 at 3.)

Whose interests Mr. Fox would be representing was an issue practically from the moment he set foot on the scene. The day after he was first called by the County, Mr. Fox called the United States Attorney, Colm F. Connolly. (Tr. at 36.) Among other topics of discussion in that call, the issue of exactly whom Mr. Fox was representing was addressed. Mr. Fox described the conversation like this:

> Mr. Connolly told me ... that some individuals, one of whom is Ms. Freebery, would need separate representation, asked me ... who I represented. I said I'm representing the County. It's not clear if there's anyone else at this point. He told me some people would need separate representation, identified some people, one of who was Ms. Freebery.

(Tr. at 36–37.) At a different time, Mr. Fox elaborated on that conversation by saying, "when I first got involved in this case, it was to represent the County in responding to the first subpoenas served by Mr. Connolly. Mr. Connolly took the position that a lawyer for the County could not represent Mr. Gordon, Ms. Freebery, or Ms. Smith and refused to discuss their status with me." (D.I. 27 at Ex. B, p. 2.)

At a September 27, 2002 meeting that Mr. Fox had with employees and former employees of the County, someone stated that people who would be asked to speak to Mr. Fox should "know all the circumstances before they start talking to an attorney that represents the county and not the individual." (D.I. 3 at 3.) That comment, of course, can be seen as reflecting a concern that employees not share confidences with Mr. Fox under the mistaken impression that they, i.e., the individual County employees, were being represented by Mr. Fox. More generally, however, it can be seen as a legitimate request that the precise contours of Mr. Fox's role be made explicit. Ms. Freebery's response to that request included the comment that, "as the Chief Administrative Officer of this government, I can tell you everyone will be cooperating with Phil Fox." (*Id.* at 3.)

If not by the time of that September 27th meeting, then very soon thereafter,[4] Mr. Fox did indeed begin representing Ms. Freebery personally, and, for nearly all of the month of October 2002, he represented both the County and Ms. Freebery with respect to the grand jury investigation.[5] (*See* Tr. at 37–39.) When he was later asked by a member of the County Law Department to take on the representation of additional County officials, however, Mr.

---

3. Citations to "Tr. at [page number]" are to the transcript (D.I. 31) of the August 23, 2004 hearing and argument in this case.

4. Mr. Fox said that he could not recall the precise date when it was determined that he was representing Ms. Freebery but it was around the time of the September 27, 2004 meeting he had with County employees and ex-employees. (Tr. at 37.)

5. According to the United States, Mr. Fox's representation of Ms. Freebery during nearly all of October is at odds with statements that Ms. Freebery made on October 21, 2002 to newspaper reporters. She is alleged to have told the reporters that Mr. Fox represented the County and not her personally, at least until the County concluded production of documents in response to the grand jury subpoenas. (*See* D.I. 3 at 1–2.)

Fox wrote back to decline and explained that, "if [he] did agree to represent more than one client and it turned out that the clients did have a conflict of interest, in all likelihood [he] would have to withdraw from representing all clients." (D.I. 27 at Ex. B, pg. 2.)

On June 9, 2004, shortly after the indictment was handed down, the United States filed a letter with the Court, noting its position that Mr. Fox had a disabling conflict of interest because "during the course of the grand jury investigation, Mr. Fox initially represented the County, which is a victim in the above-referenced case, and now represents defendant Freebery." (D.I. 3 at 1.) The United States went on to say that "the conflict can be waived if both clients, with informed consent, provide appropriate written waivers to the Court on the record." (*Id.* at 2.) Whether and how the County should express such a waiver "is not a matter on which the government has a view[.]" (*Id.* at 3.) Rather, said the United States, its interest in raising the matter is "to minimize the risk that the criminal proceedings against Freebery will be affected by Mr. Fox's conflict of interest." (*Id.*)

Mr. Fox responded by a letter dated June 10, 2004, setting forth his position that there is no conflict of interest because the interests of the County and of Ms. Freebery are not materially or directly adverse to one another in this case. (D.I. 4 at 2.) He also asserted that the United States stood silent for nearly two years during this investigation without asserting the position that he had a conflict based on his initial representation of the County. (*Id.* at 3–4.) He indicated that he anticipated the County and Ms. Freebery would waive any conflict, and then he returned to

his first theme by arguing that a conflict requires a division of loyalties, which, he said, he does not have. (*Id.* at 4.) "I have no privileged information from the County because there were no such privileged communications related to document gathering. . . . Thus there is nothing about my representation of the County that will be detrimental to my representation of Ms. Freebery, and my representation of her will have no adverse affect on the County." (*Id.* at 4–5.)

Evidently the United States, the County, and Mr. Fox communicated with one another about this issue during the remainder of June and into July, because the United States came into possession of a letter from Charles Slanina, Esquire, a respected local authority on the ethical obligations of attorneys, to Timothy P. Mullaney, Sr., Esquire, the County Attorney for New Castle County. (*See* D.I. 16 at Ex. 2.) As County Attorney, Mr. Mullaney is a political appointee of Mr. Gordon's, the defendant County Executive, and is the head of the County's Law Department. He reports directly to Ms. Freebery. (*See* Tr. at 88–90.) Mr. Mullaney had asked for an opinion from Mr. Slanina on whether any conflict of interest arose from Mr. Fox's former representation of the County and his on-going representation of Ms. Freebery and, if so, whether the County could waive any such conflict.[6] (*See* D.I. 16 at Ex. 2, pg 1.) Mr. Slanina opined that Mr. Fox's simultaneous representation of the County and Ms. Freebery, and his continuing representation of Ms. Freebery after having first represented the County, raised issues under Rules 1.7 and 1.9 of the Model Rules of Professional Conduct promulgated by

---

**6.** Mr. Slanina was not asked for and did not offer an opinion as to whether or not the County should waive the alleged conflict or whether Mr. Mullaney had the authority to do so on behalf of the County. (D.I. 16 at Ex. 2, pg. 1.)

the American Bar Association ("ABA").[7] Nevertheless, for reasons more fully described herein (*infra* at p. 589), Mr. Slanina concluded that, given the facts described to him,[8] there was not a conflict under the Rules because Mr. Fox's representation of Ms. Freebery was not "materially adverse" to the interests of his former client, the County, and that, even if there were a conflict, the County could waive it. (D.I. 16 at Ex. 2, pg. 4.)

Whatever the communications between the United States and Mr. Fox may have been, they did not resolve the concerns of the government. On July 20, 2004, the United States submitted another, more extensive, letter memorandum describing its concern that Mr. Fox had a conflict that would expose any conviction of Ms. Freebery to later attack for ineffective assistance of counsel. (*See* D.I. 16 at 11.)

Mr. Fox responded by filing on August 4, 2004, through local counsel, his Motion for admission *pro hac vice* and a supporting memorandum, taking issue with the analysis set forth by the United States in its letters. (D.I. 21.) Attached to the memorandum of law submitted with the Motion is a June 30, 2004 letter from the County Attorney, Mr. Mullaney, to Mr. Fox, stating, "I don't see how your representation of Sherry Freebery could be viewed as adverse to New Castle County. However, in the alternative, I waive any conflict of interest that could be deter-

mined to exist . . . ." (6/30/04 waiver letter attached to D.I. 21.) Also attached to the memorandum of law is a document captioned "Informed Consent to Representation" and bearing the signature of Ms. Freebery. At the August 23, 2004 hearing, Ms. Freebery confirmed under oath that the "consent" document accurately sets forth her waiver of any conflict that may arise from Mr. Fox's prior representation of the County. (Tr. at 77.) "I do not believe that my interests are in any way adverse, much less directly or materially adverse to the interests of New Castle County," she wrote, but, she went on, assuming there were a conflict raised by Mr. Fox's representation, "I consent to Mr. Fox's representation of me." (Freebery waiver statement attached to D.I. 21.)

Ms. Freebery also retained separate counsel to advise her on the ethics question raised by the United States. (*See* Tr. at 78.) Mr. Lawrence J. Fox, Esquire is a former Chair of the ABA's Standards Committee on Ethics and Professional Responsibility and a partner in the prominent Philadelphia law firm of Drinker Biddle & Reath, with extensive experience in practice and in teaching legal ethics courses. (Tr. at 57–58.) He appeared at the August 23, 2004 hearing to offer argument for the position that Ms. Freebery should be entitled to have Mr. Fox represent her in this case.[9]

---

**7.** Pursuant to Rule 83.6(d)(2) of the Local Rules of Civil Practice and Procedure of this Court, the ABA's Model Rules of Professional Conduct, not the Delaware Rules of Professional Conduct, set the standards for professional conduct for attorneys appearing before the Court. Although this is a criminal, not a civil, case, the applicability of the Model Rules has been understood to be the same. (*See* D.I. 16 at Ex. 2, pg. 2.) In practical terms, the distinction makes no difference in this case because the Model Rules and the Delaware Rules are the same.

**8.** Although Mr. Slanina notes certain facts in the first paragraph of his letter, he does not state whether those are the facts he was asked to assume and, if they were, whether they constituted the totality of the factual information he had been asked to assume for purposes of his analysis.

**9.** I will refer herein to Lawrence J. Fox as "Mr. L. Fox," to distinguish him from Mr. Fox, to whom he is no relation.

Thereafter, third parties began to weigh in on the issue. Richard H. Cross, Jr., Esquire, is an attorney representing several New Castle County citizens in litigation in the Delaware State courts seeking to prevent County tax dollars from being used to pay the defense costs incurred by the defendants in this prosecution. (D.I. 27 at ¶ 7.)[10] Arguing that "the pleadings before the Court do not appear to adequately present all of the issues that might be considered by the Court and do not appear to provide an adversarial position" from the County regarding Mr. Fox's representation of Ms. Freebery (*id.* at ¶ 9), Mr. Cross moved for leave to file an *amicus curiae* memorandum of law (*id.*) and appeared in court for the August 23, 2004 hearing.[11] The amicus arguments were being advanced, said Mr. Cross, "principally to point out that the Court is not required to accept a waiver [of the conflict of interest at issue] and this is a case where the purported waivers of Freebery and the County should be rejected." (*Id.* at 2.)

I also received a letter dated August 20, 2004, from three members of the seven-member New Castle County Council, the legislative body of the County government. (D.I. 29.) County Council President Christopher A. Coons, Councilman Robert S. Weiner, and Councilman Penrose Hollins (collectively, the "Councilmen") wrote acknowledging that they did so expressing their individual views and not those of the Council as a whole.[12] (*Id.* at 1.) While also expressing reluctance to make any statement in this case, they nevertheless explained why they were "persuaded that a conflict of interest has arisen as a result of Mr. Fox's representation of New Castle County and New Castle County's Chief Administrative Officer, Sherry Freebery, in her individual capacity." (*Id.*)

On August 23, 2004, I convened the scheduled hearing and oral argument. No other individuals or entities sought to be heard on this Motion.

*Burden of Proof*

◼ This issues presented by the Motion are presented in a curious posture. Typically a movant bears the burden of establishing the basis for whatever relief is being sought. Here, however, as already noted, the Motion is one for admission *pro hac vice*, a type of motion typically unopposed and granted as a matter of course. The United States has studiously avoided filing a motion of its own to disqualify Mr. Fox, but the papers it has filed and the argument it has presented in open Court are in opposition to the Motion and are in every meaningful sense the functional equivalent of a motion to disqualify. The burden of proving that Mr. Fox ought not be permitted to continue in his representation of Ms. Freebery, at least not as her lawyer admitted to speak for her in this case, is thus properly laid upon the United States in the first instance, and it is not a light burden. *See United States v. Micke,* 859 F.2d 473, 480 (7th Cir.1988) ("In seeking to disqualify a defendant's chosen counsel, the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualification.") (quoting *United States v. Washington,* 797 F.2d 1461, 1465

---

10. *See Mell v. New Castle County,* 2004 WL 1790140 (Del.Super., Aug.4, 2004); *Mell v. New Castle County,* 835 A.2d 141 (Del.Super.2003); *Mell v. New Castle County,* 2003 WL 1919331 (Del.Ch., April 11, 2003).

11. His participation as *amicus* was not opposed by the participants at the hearing.

12. They asserted, in fact, that the Council could not act officially because too many of its members also would face disqualifying conflicts of interest. (*See* D.I. 29 at 2.)

(9th Cir.1986)); *United States v. Fawell,* 2002 WL 1284388 at *1 (N.D.Ill., June 10, 2002) (same). "The Sixth Amendment provides that criminal defendants who can afford retained counsel have a qualified right to counsel of their choice." *United States v. Wheat,* 813 F.2d 1399, 1401 (9th Cir.1987), *aff'd,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). However, "[that] right is qualified by the need to avoid undermining public confidence in the integrity of the legal system." *Id.* at 1401–02.

In light of that qualification, it ought not be surprising that the burden does not rest wholly upon the government. If the evidence adduced demonstrates that Mr. Fox's representation of Ms. Freebery presents a conflict of interest, more particularly (*see infra* at pp. 587–89) if it shows the representation is substantially related to his prior representation of the County, and if it further demonstrates that Ms. Freebery's interests are materially adverse to the County's in this matter, then the burden falls upon Mr. Fox to establish that the County and Ms. Freebery have both consented to Mr. Fox's representation of Ms. Freebery in this case. *In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984), *cert. denied sub nom Cochrane & Bresnahan v. Plaintiff Class Representatives,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985) (citing *IBM v. Levin,* 579 F.2d 271, 282 (3d Cir.1978)).

*Discussion*

As previously noted (*supra* at n. 7), this Court has adopted the ABA's Model Rules of Professional Conduct as the governing standard for the ethical behavior of attorneys practicing before it. Because Mr. Fox represented the County first, then for one overlapping month also undertook the representation of Ms. Freebery, and then discontinued his representation of the County, there are two Model Rules that bear on the relationships Mr. Fox established. Rule 1.7 is entitled "Conflict of Interest: Current Client" and bears on the time that Mr. Fox represented both clients. Rule 1.9 is entitled "Duties to Former Clients" and is the rule that continues to dictate Mr. Fox's duties toward the County. Because I find that an analysis under Rule 1.9 is dispositive of the Motion, I need not consider the implications of Rule 1.7.

Rule 1.9(a) states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." It is undisputed that Mr. Fox previously represented the County. The first two questions, then, are whether his proposed representation of Ms. Freebery in this case is "substantially related" to his representation of the County during the grand jury investigation and whether Ms. Freebery's interests are "materially adverse" to the interests of the County. If the answers to both of those questions are yes, then the question becomes whether the County has consented to Mr. Fox's representation of Ms. Freebery.[13]

*A. Substantially Related*

■ As to the question of whether Mr. Fox's representations of the County and Ms. Freebery are "substantially related," it is abundantly clear to me that they are. Indeed, everyone involved effectively acknowledges that to be the case, except for Ms. Freebery's ethics expert, Mr. L. Fox.

**13.** *See infra* n. 22.

The United States took it as a given that the representations are in substantially related matters. It began its analysis by observing "that Mr. Fox represented the County, his former client, in 2002, in the same grand jury investigation in which he at some point represented Freebery, and out of which the pending indictment arose." (D.I. 16 at 2.) County Attorney Mullaney frankly recognized, "[i]t is apparent that the representations are substantially related ...." (6/30/04 waiver letter, attached to D.I. 21.) Mr. Slanina, the ethics expert consulted by Mr. Mullaney for the County, concluded, "these matters are substantially related ...." (D.I. 16, Ex. 2 at p. 2.) Mr. Fox himself said that, while he would not concede that the matters are substantially related, he would not argue that they are less than that. (Tr. at 35.) By the positions taken in their briefing (D.I. 27) and correspondence (D.I. 29), it is obvious that Mr. Cross as *amicus* and the Councilmen also believe that the matters are substantially related.

Only Mr. L. Fox was willing to go so far as to assert the contrary. At the August 23, 2004 argument, he reasoned that, while there was a relationship between the representations, it was "not in the traditional sense of a substantial relationship. When we're talking about a 'substantial relationship' what we're trying to prevent is ... some interference with the loyalty obligation Mr. Fox had to the County." (Tr. at 59.) He went on to say, "We do not have a situation here in my view where Mr. Fox is switching sides." (*Id.* at 60.) That analysis, however, seems to ignore both obvious facts and to jump to the conclusion it purports to reach by reasoning. First, as a factual matter, and at the

risk of making a conclusory jump myself, I confess I am hard-pressed to see how one can say that a criminal case is anything other than "substantially related" to the grand jury investigation that produced it.[14] The conclusion simply seems so plain as to put the issue beyond debate. The investigation is to the prosecution as is the parent to the child. The relationship on its face is as substantial as can be, short of full identity. Mr. L. Fox argues that Mr. Fox's role for the County during the grand jury investigation was limited. (*See* Tr. at 59.) Some may view that as a distinction to be made in the context of the "substantially related" test (*see infra* n. 16), but since Mr. Fox and others have addressed the scope of his role in the context of the "material adversity" of the subsequent representation, that is where I take up that discussion (*infra* at pp. 589–90). The Rule itself can be read as dictating the latter analytical approach, since it asks whether the matters in which the representations occurred are the same or substantially related, not whether the scope of the representations was the same or substantially related.

As to the analytical process employed by Ms. Freebery's ethics expert, the side-switching concept he focused on is the very conclusion one seeks by asking whether matters are substantially related and then whether the positions taken on the substantially related matters are materially adverse. It does not advance the analysis to assume the conclusion and then use it to preempt the premises.

Given the undisputed facts, I am compelled to conclude that Mr. Fox's representations of the County and of Ms. Freebery

14. There is also, of course, a Rule 1.9 question raised by Mr. Fox's representation of Ms. Freebery during the grand jury investigation, since he had represented the County during that same investigation and, at a minimum,

one would hope it would be recognized that an investigation is "substantially related" to itself. I am focused, however, on the Motion that puts at issue Mr. Fox's intention to represent Ms. Freebery in the present action.

are substantially related, within the meaning of Rule 1.9.

### B. Materially Adverse

There is more substance to the argument over whether Ms. Freebery's interests in this case are "materially adverse" to the interests of the County. The United States argues that the interests are adverse because the County is a victim of the crimes Ms. Freebery is alleged to have committed. According to the United States, "[t]he County is a victim because, among other things, the County was deprived of the honest services of Freebery (and others) and/or money" in connection with the various schemes charged in the indictment. (D.I. 16 at 4.) That view is shared explicitly by the Councilmen (D.I. 29 at 2) and implicitly by the *amicus* (D.I. 27 at 7). Messrs. Fox, Mullaney, Slanina, and L. Fox, however, say that the interests in play are not materially adverse.

From the arguments of the latter group, three reasons for their position emerge. First, as a matter of fact, Mr. Fox was only gathering documents to answer subpoenas served on the County and he received no information that would prejudice the County as he advocates Ms. Freebery's positions. (*See* D.I. 4 at 2–3; D.I. 21 at 6–8; Tr. at 41–45, 53.) Second, they argue that, regardless of the scope of Mr. Fox's representation of the County, the County cannot fairly be viewed as a victim because no crime has yet been proven. (*See* D.I. 4 at 2; D.I. 21 at 4–5; 6/30/04 waiver letter

attached to D.I. 21; D.I. 16 at Ex. 2, pg. 3; Tr. at 63.) Finally, at oral argument Mr. L. Fox seemed to take the position that, whether or not the County is a victim, its interests may be better served by an acquittal of Ms. Freebery and therefore Mr. Fox's representing her is not materially adverse to the County.[15] (Tr. at 63.) I address each in turn.

### i. Scope of Representation

To begin with, I note again that this line of argument can be seen as an effort to say that the matters are not really "substantially related."[16] However the argument is couched, its factual foundation is wanting.

The assertion is made that the County only tasked Mr. Fox with gathering documents. What the County expressly asked him to do when it hired him is relevant but, of course, subject to the vagaries of memory and point of view. More objective evidence is available by reviewing what Mr. Fox actually did. The line between a simple, document-gathering assignment and a more substantive inquiry into potential political corruption charges was apparently less clear in 2002 than is claimed today. Mr. Fox's own recent statements lead me to conclude that the scope of his representation was not as narrowly confined as a just-give-me-the-documents description suggests. In his June 10, 2004 letter, Mr. Fox described the three subpoenas to the County as "very broad." (D.I. 4 at 3.) He said that when he went to

15. Mr. L. Fox stated that "the County's interest may be just as much in having Ms. Freebery acquitted. The County may be far better off in having all of this end up with 'we find that there is smoke but no fire' or whatever it is that will come as a result." (Tr. at 63.) His comments can be viewed as a variation on the "no victim until a crime has been proven" theme, but they may also be viewed as making the distinct argument that Ms.

Freebery's acquittal may be in the County's best interest, regardless of her guilt.

16. As noted (*supra* at 587–89), Mr. L. Fox treated it as such, discussing the assertedly limited nature of Mr. Fox's engagement by the County in the context of his argument that the representation of the County and of Ms. Freebery are not substantially related. (*See* Tr. at 59.)

work for the County he "began to try to figure out what this case was all about, which required speaking to employees." (*Id.*) And, again, he said, that he "did talk to a number of employees at the outset when [he] was trying to figure out what all this was about." (*Id.* at 4.) All of this suggests that he was engaged in a substantive investigation during the time he was working for and being paid by the County. Further evidence of that is found in his letter of October 25, 2002 to Mr. Connolly. Recounting a conversation between the two of them that took place a few days earlier, Mr. Fox stated, "You told me that my client[17] 'has' extorted employees to work on political campaigns going back to the 1996 campaign .... At the outset, I note that that statement is contrary to the facts, as I know them." (8/23/04 Hearing, Gov't Ex. 1, p. 2.) Later in the same letter, Mr. Fox states, "Our witness interviews contradict your conclusions." (*Id.*)

Whether or not the assignment given him included the words "do a full investigation and report," it appears he did in fact undertake an investigation into the potential charges against Ms. Freebery. He clearly conducted interviews of County employees that went beyond gathering documents to respond to the subpoenas. When I asked Mr. Fox during oral argument to respond to the assertion that he had conducted substantive interviews with

County employees, i.e., interviews that went beyond the gathering of documents, he frankly acknowledged that he had.[18] Those employees are potential witnesses in this case, and those interviews took place under the express direction of Ms. Freebery herself, asserting her authority in the name of the County and telling the employees, "as the Chief Administrative Officer of this government, I can tell you everyone will be cooperating with Phil Fox." (D.I. 3 at 3.)

Thus, even if I were to accept the assertion that working with an alleged victim to respond to a grand jury subpoena for documents is so narrow an assignment as to eliminate the possibility of material adversity with the interests of a target of the grand jury's investigation, I am dealing here with more than mere document gathering. Ms. Freebery's own ethics expert acknowledged that, if the County did hire Mr. Fox to investigate,[19] then the side-switching prohibition in Rule 1.9 would come into play. (*See* Tr. at 67.) I find that Mr. Fox did launch an investigation, he did it while he was employed by the County, and he did it with the backing of his other client, Ms. Freebery, in her official capacity, requiring the cooperation of all County employees.

### ii. *Victim of Crime*

The main focus of the arguments on behalf of Ms. Freebery and by Mr. Mulla-

---

17. Obviously, the reference to "my client" here refers to Ms. Freebery, although Mr. Fox was representing both Ms. Freebery and the County at the time.

18. The exchange on this point went as follows: "[The Court:] ... I have before me a factual contention that you conducted substantive interviews with employees. That's been said in correspondence and said from this podium today. And by 'substantive interviews' I mean more than show me your document. You talked about the substance of the allegations and people talked to you back and

gave you information. That is the allegation before me.... [Mr. Fox:] I don't dispute that. I don't dispute beginning on October 4, I had substantive conversations with employees of the County. What I'm telling you is that I made clear that I was interviewing them in my capacity as Ms. Freebery's lawyer." (Tr. at 50–51.)

19. He also included the caveat that the matters would have to be viewed as being substantially related. As already noted (*supra* at pp. 587–88), I have reached the conclusion that they are.

ney is that the County cannot properly be viewed as a victim in this case. In his first submission to the Court on this topic, Mr. Fox stated, "[t]o assert that the County is a 'victim' requires one to jump to the conclusion that the allegations set forth in the indictment are true." (D.I. 4 at 2.) According to Mr. Fox, the County is really more like a tangentially interested third party with no more than a "rooting interest." "For example," he said, "Coke may have a rooting interest against Pepsi's prevailing in a lawsuit against a third party, but that would not disqualify a lawyer who represents Coke from representing Pepsi." (*Id.*) Mr. Mullaney put it this way at oral argument: "When I look at it, the County has been framed in the Government's papers as a victim, I look at the fact I don't think the County should have an interest in seeing whether someone is convicted or not convicted. I think the County's interests should be one of neutrality." (Tr. at 93–94.)

In response, the United States argues two points. First, that implicit in the "no victim yet" argument is the assertion that this matter is being raised too soon and should be dealt with post-trial. (*See* D.I. 16 at 5–6 & n. 6.) Second that, in light of both the ordinary meaning of the word "victim" and federal statutes regarding victims' rights, the County should be viewed as a victim. (*Id.* at 4–5.) As to the first point, I agree that I cannot delay the conflicts analysis until after a trial and that the constitutional presumption of innocence is not at issue. To accept the argument that, for purposes of a conflicts analysis, there can be no victim until after a finding of guilt is to say that there can be no meaningful conflicts analysis at all. Were I to wait until after trial, the rights to be vindicated would already be irretrievably lost. Tackling a conflicts issue at any point in the criminal justice process is not a pleasant prospect, but when it is

required it must be attended to promptly. The Supreme Court has spoken directly on this point: "Unfortunately for all concerned, a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat v. United States,* 486 U.S. 153, 162, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).

As to the assertion that the County is no victim but simply a neutral third-party with, at most, a rooting interest, I again hold that the United States has the more persuasive argument, indeed, the vastly more persuasive one. Private business disputes are often important, but this is not merely a contest between private business interests. It is not akin to the cola wars, as the Coke and Pepsi analogy implies. The allegations in this case implicate fundamental issues of representative government and the most basic rights of the County's citizens to the honest services of elected and appointed officials. Said in the context of voting rights case, the Supreme Court's observation about the integrity of officials in the political process is relevant here: "They are not acting in matters of merely private concern like the directors or agents of business corporations. They are acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions unbrokenly and smoothly." *Nixon v. Condon,* 286 U.S. 73, 88, 52 S.Ct. 484, 76 L.Ed. 984 (1932). It is simply untenable to suggest that the County's interests are not directly and deeply involved in this dispute.

The County's resources, the moneys, material, and manpower acquired at public expense are said to have been diverted to

the personal interests of Ms. Freebery, among others. (*E.g.,* D.I. 1 at ¶¶ 16–50.) The grand jury that returned the indictment made a probable cause finding to that effect. *See United States v. Sells Engineering, Inc.,* 463 U.S. 418, 423, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983) (the grand jury "serves the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions") (internal quotation marks and citation omitted). Pertinent federal statutes make it plain that the County is therefore a "victim" of the alleged crimes. *See* 18 U.S.C. § 3663(a)(2) (for purposes of restitution, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered ...."); 42 U.S.C. § 10607(e)(2) (for purposes of "services to victims" statute, "the term 'victim' means a person that has suffered direct physical, emotional, or pecuniary harm as a result of the commission of a crime").

The conclusion that the County is properly viewed as a victim for this conflicts analysis is strongly supported by the opinion of the United States District Court for the Northern District of Illinois in *United States v. Fawell,* 2002 WL 1284388 (N.D.Ill., June 10, 2002). In that case, the Illinois Secretary of State's office had been represented by an attorney that subsequently sought to represent a defendant accused of defrauding the people of Illinois "by using personnel and resources of the Illinois Secretary of State's office to conduct political campaigns" for the individual who was then the Secretary of State. *Id.* at *1. In granting a pretrial motion to disqualify that attorney, the court observed,

> [T]he grand jury has found probable cause to believe that [the defendants] misused the public resources of the Sec-

retary of State through a pattern of racketeering activity. The Secretary of State's interests now appear to be aligned with those of the United States in seeking convictions for unlawful conduct and an award of restitution. Rule 1.9(a) perhaps has more frequent application in a context where a previous client will be a government witness; but in this court's view, the plain language of that Rule also fits here and casts a dark shadow over the propriety of [the disqualified attorney's] role as lawyer for [one of the defendants].

*Id.* at *8.

I note too that the adversity of interests here is borne out by Mr. Fox's previous writings (*see* D.I. 16 at Ex. 4, p. 187) and by statements from Mr. L. Fox at oral argument (Tr. at 67). Mr. L. Fox seemed to acknowledge that, if Mr. Fox's role involved conducting a substantive investigation regarding Ms. Freebery's alleged crimes, then the ethical rules would forbid his serving as attorney for Ms. Freebery without a waiver by the County. (*Id.*) Both Mr. L. Fox and Mr. Fox analogized Mr. Fox's circumstances here to an attorney representing a private corporation (*see* Tr. at 43–44, 68), which is noteworthy because, outside the heat of this particular dispute, Mr. Fox wrote an article calling into question the type of representation he proposes to undertake here. In "Considerations for Corporate Counsel Faced with a Federal Investigation," which he prepared for an American Law Institute—American Bar Association course of study, Mr. Fox stated:

> On occasions a corporation is involved in a criminal investigation because it is perceived as being the victim of the crime....

> If the corporation is the victim, clearly its attorneys cannot represent targets of

the investigation. The interests of the corporation and the individuals conflict directly. If money has been taken form the corporation, the corporation will not only be interested in making sure that the perpetrators are caught and punished but also in obtaining restitution from them. The federal criminal laws provide for restitution to the victims in certain instances and a civil suit is also possible.

(D.I. 16 at Ex. 4, reproducing text of article at p. 187.) Mr. Fox's instruction is to the point: "If the corporation is the victim, clearly its attorneys cannot represent targets of the investigation."

Under Rule 1.9, there are at least two fundamental reasons for that prohibition: the County's right to expect that its confidential communications will not be used to its detriment,[20] and, closely related to that, Mr. Fox's duty of loyalty to the County. *Cf. Wheat*, 813 F.2d 1399, 1403 n. 1 ("A substantial relationship between successive representations often triggers concerns about divided loyalties and conflicts of interest.") (citing Rule 1.9).[21]

Regarding the protection of confidences, Rule 1.9 is designed to avoid the problem inherent in the shift Mr. Fox seeks to make. Despite my efforts to get an answer to the question of who will stand up and speak for the County to prevent the use by Mr. Fox for Ms. Freebery of information the County may consider confidential (*see* Tr. at 42–52), the only response I received was that Mr. Fox does not believe he learned anything confidential while rep-

resenting the County (*id.* at 46, 50) and that the County is waiving the issue anyway (*id.* at 52–53). As to the first aspect of that response, just because Mr. Fox can think of no confidences that does not mean there are none to protect. The County's ethics expert, Mr. Slanina, aptly observed that, "Rule 1.9 has an inherent presumption that the lawyer had access to confidential information in the previous representation." (*See* D.I. 16 at Ex. 2, p. 3.) *See United States v. Provenzano*, 620 F.2d 985, 1005 (3d Cir.) (attorney's access to privileged information conclusively presumed once attorney-client relationship established), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). Moreover, as already noted (*supra* at pp. 589–90), Mr. Fox's work went beyond mere document gathering and included substantive investigative discussions with County employees. Given that, it would be extraordinary if Mr. Fox could say with certainty that no information was given that might later present a problem while he is representing Ms. Freebery. *Cf. Wheat*, 486 U.S. at 163, 108 S.Ct. 1692 ("It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand.")

As to the second aspect of Mr. Fox's response to my question, the observation that the County was waiving any conflict, that speaks past the point, not to it. It's true that a valid waiver could obviate the

---

**20.** Mr. Fox contended at oral argument that Rule 1.9 forbids the sharing of privileged information, but he appeared to take issue with the assertion that non-privileged but nevertheless confidential information is also protected by the Rule. (*See* Tr. at 42–43.) The Rule has not been interpreted so narrowly in this Circuit. *See In re Corn Derivatives*, 748 F.2d at 162 (citing Rule 1.9 and observing that "[i]t is

a prophylactic rule to prevent even the potential that a former client's confidences *and* secrets may be used against him.") (emphasis added).

**21.** A third reason, maintenance of public trust in the integrity of the bar, is also an important consideration. *In re Corn Derivatives*, 748 F.2d at 162.

need to answer the question of who protects the County's confidences, but the question remains unanswered in any event. From the perspective of the Councilmen, it is a question that demands an answer. They emphasized it as "of particular concern to us ... that Mr. Fox interviewed county employees and assured them that he represented the County." (D.I. 29 at 1.) Mr. Fox's response to that concern would likely be, as it was to my questions during oral argument (Tr. at 42–44), that the attorney-client relationship he had ran to the County itself, not to any particular employee. But the County itself, absent a waiver, has an interest in not having its confidences, elicited from its agents, divulged or used to the detriment of the County. The issue of divulging or using confidences weighs against granting the Motion.

■ Even in the absence of the issue of confidential communications, however, the duty of loyalty strongly counsels against allowing the representation, absent an appropriate waiver. "Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties." *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir.1991). That is true with regard to institutional clients, who can only be cross-examined through their agents, *see In re Corn Derivatives*, 748 F.2d at 162 (disqualifying law firm under Rule 1.9 from representing a corporation subsequent to representing another corporation with adverse interests), and it is true regardless of the background of confidential communications. *See id.* at 161 ("This is not merely a matter of revealing or using the client's confidences and secrets, but of a duty of continuing loyalty to the client."); *United States v. Cooley*, 243 F.Supp.2d 329, 332 (W.D.Pa.2003) ("[T]he mere fact that [de-

fense counsel] is not currently possessed of privileged information from [former clients] ... does not end the inquiry.... [Defense counsel's] duty to [new client] would require him to attack the credibility of his former clients on any available legitimate basis."); *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 395 (S.D.Tex. 1969) ("If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself—a relationship which must be one of trust and reliance—they can only undermine the public's confidence in the legal system as a means for adjudicating disputes.").

Under the circumstances, there has been, at a minimum, "a showing of a serious potential for conflict" if the Motion is granted, *Wheat*, 486 U.S. at 163, 108 S.Ct. 1692, and therefore denial of the Motion is the better course in this case, absent an effective waiver.

### iii. *Acquittal as Best Interest*

I address only briefly the suggestion that the County's interests may best be served by an acquittal. This recasts the argument that the County ought not be, as Mr. Mullaney put it, a "cheerleader" (Tr. at 94), but the general import is the same, namely that it is impossible to know what the County's interests really are at this stage of the game. For the same reasons that I rejected the argument that the County cannot be called a victim now, I also reject the assertion that I must now view it as equally likely that the County's interests will be best served by an acquittal. If the matters alleged are proven beyond a reasonable doubt, the County's interests are clearly in seeing a conviction, an opportunity for restitution, and, perhaps most significantly, a restoration of public trust. If they are not so proven, then it may well be true that an acquittal

will be good not only from the defendants' perspectives but from the County's as well. At the present juncture, looking solely at the question of conflicts of interest, however, I reiterate that the showing of a serious potential for conflict is sufficient to call the interests of the County and Ms. Freebery "materially adverse" and to therefore require the County's written waiver as a prerequisite to the granting of the Motion.

### C. Consent of the County

As earlier noted (*supra* at p. 587), the burden of proving the consent of the County rests on Mr. Fox. To carry that burden, he has presented the letter that Mr. Mullaney wrote to him on June 30, 2004, stating, "I waive any conflict of interest that could be determined to exist in your former representation of New Castle County and your current representation of Sherry Freebery." (6/30/04 waiver letter attached to D.I. 21.) The question thus becomes whether the waiver presented by Mr. Mullaney is sufficient to bind the County.[22] I hold that Mr. Fox has failed to carry his burden of proof on this issue.

Under Delaware Law, Mr. Mullaney is appointed by and serves at the pleasure of defendant Gordon, the County Executive. 9 Del. C. § 1392. The organizational structure of the County has him reporting directly to defendant Freebery, the County's Chief Administrative Officer. (*See* Tr. at 89–90.) He is responsible for managing the County's Office of Law and performing the following functions: "serv[ing] as Chief Legal Advisor to the County Executive, County Council and all County departments, boards, offices and agencies; repre-

sent[ing] the County in all legal proceedings[.]"[23] New Castle County Code Sec. 2.05.514 (Ord. No. 98–050, § 2(2–174), 5–26–1998). At oral argument, Mr. Mullaney explained how it came to be that he wrote the letter purporting to waive the County's interests in this matter.

> [I]t's quite clear in past practices that the County Executive, as the Chief Officer of the County Government, he signs all contracts. He acts as the person whose signature is required for any official action of New Castle County Government. As such, he is the one through the description of his office who would be dealing with this [conflict-of-interest] issue.... I think it's within his power to delegate that authority. I think that since the conflict issue is usually dealt with in conjunction with the Office of Law, it seemed only natural and logical that is where he would go and delegate the authority to my office.

(Tr. at 92.)

The United States, while disclaiming an intent to dictate who might properly waive the County's interests (D.I. 16 at 11), nevertheless points to the circumstances of Mr. Mullaney's job, i.e., one who serves at the pleasure of one defendant and reports directly to another, as placing him in such a conflicted position that he is not the proper person to waive Mr. Fox's conflict. (*Id.*) The Councilmen also assert that Mr. Mullaney is not in a position to waive the County's interests. Although Mr. Mullaney asserts that the County Council has been informed of Mr. Fox's representation of the County and of Ms. Freebery during the investigation (Tr. at 95), the Councilmen argue that all who might purport to

---

**22.** I find that Ms. Freebery's waiver, described earlier (*supra* at p. 585), is a knowing and voluntary waiver and constitutes the type of written consent contemplated by Rule 1.9.

**23.** The same section of the County Code also includes a catch-all provision allowing the County Attorney to "[p]erform any other duties prescribed by this title or by ordinance of County Council."

speak with authority for the County on this issue, including Mr. Mullaney, suffer disqualifying conflicts of their own. (*See* D.I. 29 at 2.) Hence, they say, "[w]e believe where no legitimate waiver is possible, attorney disqualification should occur." (*Id.*) The *amicus* argues that this case is of such public importance that the County's interests should be viewed as unwaivable. (*See* D.I. 27 at 9–10.)

I need not decide whether the conflict is, under the circumstances, unwaivable. It is sufficient to hold that it has not been demonstrated that it has been properly waived. This case is a study in conflicting and potentially conflicting relationships,[24] and those conflicts undermine the purported waiver tendered by Mr. Mullaney.

The authority Mr. Mullaney claims to exercise in the name of the County Executive is suspect from the outset because, under the circumstances, Mr. Gordon is so obviously conflicted. It is highly questionable that he could properly exercise any authority at all with respect to the waiver at issue, including the purported delegation of the authority to Mr. Mullaney. Assuming, as I do for purposes of this analysis, that Mr. Gordon would have authority on behalf of the County to waive a conflict of interest, it does not follow that that authority is freely delegable.[25] Moreover, given the evidence and allegations, the purported delegation by Mr. Gordon to Mr. Mullaney can be seen as at least as likely to have been a self-interested act by Mr. Gordon, taken with the intent of securing a waiver regardless of its propriety, as it is to have been a good faith attempt

to deal with the conflicts issue. No one has provide me any legal precedent or authority to substantiate that the purported delegation to Mr. Mullaney is well-founded under general principles or in the particulars of this case. There is thus considerable doubt that Mr. Mullaney ever received a proper delegation of the authority he has acknowledged is not customarily his.

Beyond that, Mr. Mullaney himself suffers from a clear conflict because his job literally depends upon staying within the good graces of the County Executive and because he directly reports to Ms. Freebery, the individual who has the most to gain from the waiver. Thus, even if the delegation by Mr. Gordon were proper, the individual to whom he delegated it is himself so conflicted as to call the waiver into serious question. I do not doubt Mr. Mullaney's sincerity, but the reality is I have no one's say so but his that he is the proper person, duly authorized,[26] to waive the County's interests in this matter, and he has debilitating conflicts of his own. I therefore cannot say under these circumstances that Mr. Fox has shown that the waiver tendered by Mr. Mullaney is an effective exercise of the County's authority, that it is, in other words, a knowing and intelligent waiver of the County's rights by one in authority to make such a waiver.

*Conclusion*

I recognize that this decision may work a financial hardship on Ms. Freebery, which is a matter of genuine regret. Nevertheless, despite Mr. Fox's accusation

---

24. While perhaps said facetiously, Mr. L. Fox summed up how knotted the relationships are when he said that, just to get an ethics opinion, "[t]hey [presumably the defendants] had to go out-of-state to find somebody with no conflict to give advice on conflicts of interest." (Tr. at 58.)

25. Basic principles of administrative law hold that while ministerial functions can be delegated to assistants, there is generally no authority to delegate discretionary functions. 2 AmJur2d, Administrative Law § 68 (2004).

26. *See supra* n. 6.

that the United States sprang this issue at the eleventh hour (*see* D.I. 4 at 3–4), the admitted facts are that the U.S. Attorney's office raised the issue of separate representation for the County and the individual targets of the grand jury investigation in the very first conversation between the government and defense counsel two years ago.[27] There were other direct communications demonstrating that Mr. Fox was well aware that this was an issue from the start.[28] *See Moscony,* 927 F.2d at 747 (noting that disqualified defense counsel had proceeded with conflicting representation "despite several warnings from the government that the multiple representation might pose a conflict of interest").

Even if the United States had not raised this issue, had sufficient facts about the conflict come to light in the course of the case I would have been required to raise and address the matter on my own. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat,* 486 U.S. at 160, 108 S.Ct. 1692. This is a matter of exceptional public consequence in this District, involving allegations both of corruption in the day-to-day operations at the upper echelon of government in the State's largest County and in the election processes foundational to that government's legitimacy. *Cf. United States. v. Panarella,* 277 F.3d 678, 696–97 (3d Cir.2002) ("Critical to the health of the electoral process is the voters' ability to judge whether their rep-

resentatives are acting to further their own financial self-interest instead of the public interest."). It is thus of utmost importance that these proceedings not only be truly fair but that, to the fullest extent possible, they be so dealt with that they are rightly perceived as such. The "dark shadow" that some apparently already perceive (*see* D.I. 27; D.I. 29) and that would be more prominently cast over these proceedings were the Motion to be granted and Mr. Fox permitted to represent Ms. Freebery in this case, *see Fawell,* 2002 WL 1284388 at *8, cannot be permitted to linger.

Accordingly, the Motion (D.I. 21) will be DENIED. An appropriate Order will follow.

## *ORDER*

For the reasons set forth in the Memorandum Opinion in this matter today,

IT IS HEREBY ORDERED that the motion of Hamilton P. Fox, III, Esquire for admission *pro hac vice* (Docket Item 21) is DENIED.

---

**27.** Mr. Fox asserted unequivocally that, during the nearly two years between the time he was engaged to work for the County and the time the United States raised the conflict issue with the Court, "no one ever suggested that I had a conflict." (D.I. 4 at 4.) He also admitted, however, that from the outset, "Mr. Connolly told me ... that some individuals, one of whom is Ms. Freebery, would need separate representation ...." (Tr. at 36–37.)

**28.** *See* Defendant's 8/23/04 Hearing Ex. 1 (10/8/02 letter from Mr. Fox to Mr. Connolly, stating, "[t]here is no conflict between advising the County on how to make a full and complete production [of documents in response to the grand jury subpoenas] and the representation of Ms. Freebery ....").